25-1684 American Freedom Law Center, Inc. v. Dana Nessel, et al. Oral argument not to exceed 15 minutes for the plaintiff, 15 minutes to be shared by defendants. Mr. Mewes, for the appellant, you may proceed. Good afternoon. May it please the Court, I'm Robert Mewes and it's my honor and privilege to represent the plaintiff appellant in this case and I'd like to reserve three minutes of my time for rebuttal. Michigan Attorney General and the Department of Civil Rights are weaponizing their powerful government offices and misusing government resources to target political opponents. It's one thing for a partisan private organization like the Southern Poverty Law Center to express its falsehoods about political opponents. However, when the Attorney General and the Department of Civil Rights join and officially endorse this partisan attack by lending government resources and then becoming a government enforcement agency of this political attack, the injury to the plaintiff is concrete and the protections of the United States Constitution are triggered. The big picture issue that you sort of teed up, it's pretty common for politicians at the state and federal level to criticize private entities, individuals, companies, happens all the time. Sometimes it's conduct, sometimes it's a speech that other people are engaging in. So to rule in your favor, I know there are like core legal questions, but just a core principle, how would a ruling in your favor sort of impact the broader speech that we just traditionally hear from elected officials or candidates? Right, and I think here you have the Attorney General of the state of Michigan with her law enforcement authority claiming very publicly that she's going to combat, tackle, fight those words from her. I mean, governors use those words all the time, Attorney Generals, people use those words all the time. Yeah, I don't, not in the context of, you know, the law enforcement, she creates this hate crimes unit specifically for that reason. I mean, look at Meese v. Keene and Parsons, right, those are the two cases that I think are critical here. I mean, you can make the same argument there, but in both cases, one the Supreme Court and then this court, the Sixth Circuit, found that they had standing to make those, to make those allegations, those claims that those are violations of, in the case of Parsons, the APA as well as the constitutional rights in Meese v. Keene, the First Amendment. So the courts have recognized that, yes? I want to take just a very different case from a website reference in a press release. The, in Parsons, there was clear activity that resulted from the case. Improper stops, detention, tattoo removal, interrogations, searches. I'm concerned that this does not seem, that most of your argument assumes that you can state the claim and that that's all you need. So why would you be like the juggalos, is that what they call themselves? I believe that's what they call the juggalos, right. How would you be in that situation? Well, Judge, the case in Parsons, in addition to those, the injuries that you identified, the court said very clearly that stigmatization constitutes an injury in fact for standing purposes. It's not stigmatization and plus. So they had standing based on just that, just like with the Meese v. Keene. So while you may have had these other additional injuries, and we certainly are suffering injuries financially and reputationally and having to try to restore our image. We're a non-profit public interest law firm. We have donors that are questioning why is the Attorney General, you're on their radar to, you know, she's going to attack, combat and go after them. This is a question to ask them. Who are those donors and when were they questioning? Because the record does not necessarily bear that out. Your Honor, and bear in mind, this isn't a damages case, right? So we don't have to have specific dollar amounts because we're not seeking damages. We're only seeking injunctive relief. You have to have harm. You're tying that harm to disgruntled donors. Not just disgruntled donors, but all the effort that we have to put in place to restore our image publicly. Is there no record evidence of disgruntled donors? Well, it's interesting. And here's Mr. Urshami. We rely on his deposition testimony and his affidavit to demonstrate the harms that are attached to this pejorative label that's been attached to us by the government. He said, when I get phone calls and people reaching out to me trying to understand what this is all about and donors who are fearful about being exposed as a result of this, you can bet your bottom dollar that AFLC has been damaged. Again, this isn't a damage claim. One thing that's interesting, if you look at the interrogatories... There's got to be harm. There is harm. Concrete harm. Reputation is one of those. Reputational harm is one of those harms. There's a reason why we have defamation per se. Reputational harm is one of those things that transcends. When you're a non-profit, you have to rely on donations. And you have to rely on people who want to seek out your services. And you're having to battle with the Attorney General and the Michigan Department of Civil Rights who have now designated you essentially a criminal organization. She said as much in her Facebook post. Much of the evidence that is referenced but not necessarily existing in the record is from activity from 2015 until the February of 2019 time frame. How can those old events be attributable to the Attorney General when in fact they were as a result of the Southern Poverty Law Center's hate map? Because it's the government's endorsement of that. Judge Maloney addressed that in his decision. The first one where he found standing in Parsons... That's a different standard. The motion to dismiss standard counsel is clearly distinct. Because you were allowed to go forward and then your job was to place evidence in the record that would support your claims. And what the judge found was that you failed to do that. I'm asking you about the causation question.  And I'm trying to answer with the... If you look at Meese and you look at Parsons, both courts rejected the argument. This is what the Sixth Circuit, this court said, the agencies argue that the alleged reputational harm and chilling effect would not be remedied by an order because information about the criminal activity performed by juggalos is available from a variety of other sources. The Supreme Court said the same thing. The harm to plaintiff occurred because the Department of Justice had placed a legitimate force of its criminal enforcement powers behind the label. It is that. This is what the judicial court said, and it was correct. ABC has identified a legal authority which, on the facts established with Yerushalmi's affidavit. So that's why this idea that the original motion to dismiss was just based on the allegations, it's not true. We submitted an affidavit with factual evidence and he cited to it demonstrates the causation and redressability element for standing. At that first stage, we said it was plausible, or the district court said it was plausible. Right? I mean, that's the standard at a motion to dismiss, is plausibility. It was a 12-B-1, and you can have factual, you can have based on allegations, and we submitted factual evidence to support it. Just like in Meese v. Keene. So there was some evidence there. What's hard, and I think you're getting at this point, is when we have, like I believe your opening statement talked about these falsehoods from the Southern Poverty Law Center and how much damage this caused, and now maybe another government entity has picked that up. But how do we find in the record, how do we disentangle harms that were caused by the Southern Poverty Law Center versus caused by a link in a press release to the Southern Poverty Law Center's map? And I think what we're trying to do is get to what's in the record. Now, we have this one affidavit of these kind of generalized statement of, you know, yeah, somebody has called, and I think we're trying to get a sense of timing of, I think, Judd Braidfler's question, like who, when exactly, and things like that, so that we can disentangle the causation question. Your Honor, but I think that's a mistake. And I think this Meese versus Keene as well as Parsons makes that point as well. And again, this isn't a damages case. We're not laying out specific damages, but I will make this... But you do understand that there's a causation question. I do, and I think... And that causation gets linked to injury. So while we're not quantifying any damages, we do need an injury, kind of like a damage. We need some harm, right? And it has to have a causal connection. So it's not a damages question, but we have to both look at harm and causation. Yeah, stigmatization is a harm. And it can be caused by more than one entity. And in this case, it's worsened by the fact that you have the government using its government resources to do that. That injury is sufficient for a standard. Do you think we can, based on the case law, then just kind of have a presumption? Like, well, if the government says it too, that's, like, necessarily going to amplify a message. That's, like, just necessarily... It's not a... Maybe it's just a very reasonable inference that it's going to be a problem. Your Honor, I think Parsons and Meese v. Keene answers this particular question, the fact that there may be additional harms. The very fact that this... And I can't see how the court refutes that. Hate...describing somebody as a hate organization is not stigmatizing and pejorative. And it's a total different animal when you have the government using its resources to do that than a private organization. A private organization can't violate my constitutional rights. The Attorney General can. And is what they're... She says, I'm going to combat, I'm going to tackle, I'm going to fight these groups. And then we file a lawsuit, and it's like, well, really, we were just kidding. We really were only kidding. Never mind. I didn't really mean that. So might it be that you don't really need that evidence at all of some, you know, particular donors or people that you could just say, hey, the government's a strong entity and it's amplified this message. That's a harmful message. That's enough. We don't need anything else. I think Parsons and Meese make the point that the government's imprimatur giving its enforcement to that label causes the additional...the necessary harm. Remember, fairly traceable is not proximate cause. When you answer... When you answer the question, I would like you to include the standard that applies to this case. This is Ex parte Young. We are looking for prospective damages. So even, let's assume that you have some sort of harm in the back from February 19 to about a year later in 2020. How can you meet the standard of showing that you now face, where in the record is the information showing that you now face a real and immediate threat of repeated injury? That's the standard. And one of the problems you have with reputational injury, you have that bell that's been rung. You have these government records now, and we put them in there, not just the press release, but also her testimony and also this spreadsheet that they had identifying the American Freedom Law Center as a hate group. These are all part of government records now that are now subject to FOIA. But actually, they're no longer even on the website after 2020, about a year, and where people might be obtaining that information now is from your own publication and statements. So why is there, I understand our case law to say that the reputational harm can be dissipated over time. We're talking about seven years later, seven years after 2020. In which the only public site, short of a FOIA request, which has been at law said to be insufficient, where is the harm that is forward-looking injury, a substantial risk in the near future? How do you meet that standard? Because that reputational harm is still there. You can still get reports about this, the AG's identification of us as a hate group from the internet, whether it be... ...that once they have posted it, even if it's removed, even if it's seven years past, that your claim goes on... I would, this is what in the Fortich case, the court made the point about an unredacted, unremedied, they've never redacted that, they've never remedied that. This thing has been up on the website for over a year. We gave them even an opportunity, the interrogatories, to disavow this public identification of the American Freedom Law Center as a hate organization, and that we only engage in, and they refuse to do so. But the cases that recognize dissipation do not hinge upon having redaction. They hinge upon time. You are now six years out. I don't think that's, not with a government agency who also has the resources available to them, it also has these as part of the government records that are always now officially part of the government records, we have to deal with this. There's been nothing to remedy that injury. And I wish I had a couple more times, because there was a couple, two other things, can I go over just one? You're well over your time, but I have one other question. Did you seek a preliminary injunction in this case? Did we? No, we did not. I mean, this thing, we just didn't, I don't know. What's that? That would have nipped the harm in the bud more quickly. Yeah, but again, this is one of those reputational harms that continues. The reputational harm probably started right away. It's pretty serious, you might have thought to get a preliminary injunction. Well, and the judge waited four and a half years to rule on this, after we had a ruling on that. If you had asked for a preliminary injunction, presumably the judge would have ruled much quicker. I hear you on that, and I will ask the other side about that. Yeah, and I've been doing more preliminary injunctions because of delays, for that very reason. Alright, thank you. We have your rebuttal time, too. Good afternoon, Your Honors. May it please the Court. I am Assistant Solicitor General Kyla Barranco on behalf of Michigan Attorney General Dana Nessel. I'll be arguing for ten minutes and my co-counsel for five minutes. Seven years ago, the American Freedom Law Center filed suit against the Attorney General based on a quote that she provided in a Michigan Department of Civil Rights press release. That press release is no longer available on any of the state's websites, as Judge Stranch referenced earlier, and it was gone at the latest of March of 2020. Following discovery, the American Freedom Law Center has failed to prove a single concrete injury stemming from that press release or the Attorney General's Hate Crimes Unit. It has not been investigated or prosecuted by the Hate Crimes Unit. It continues to take on new clients, engage in advocacy, and continue its mission uninterrupted. But does the state believe that the organization is a hate group? The Attorney General, in April 2019 testimony, she testified before the Michigan Senate Oversight Committee. She indicated that the Hate Crimes Unit is not intended to prosecute thoughts, police thoughts, and that it wouldn't be looking at the Southern Poverty Law Center's list. So she has, since February 2019, two months later, walked back those statements. She also said bring it on, right? At some point, when was that statement made? That statement was made so plaintiff filed suit February 28, 2019, that same day. I believe the exact wording of that was only in Trump's America do you get sued for pledging to prosecute hate crimes and pursue organizations that engage in illegal conduct. So even that Facebook post, which she then said bring it, shows that the Hate Crimes Unit, which this is actually a week before the Hate Crimes Unit was actually even went live, so to say, and its policies were established over time. It shows that that unit was not going to police thoughts or words. It wasn't going to go against groups merely for exercising their First Amendment rights. I guess there's more to what you intended than how it was received by people in the public, including donors and supporters of the organization. But just to, back to my other question, so the Attorney General does not believe that AFLC is a hate group, correct? Your Honor, she was not deposed in this case, so there's no testimony on what she thinks. I think I could... You're her lawyer, I'm asking the question. I don't think that she believes that they are a hate group. I think she knows that they are on the Southern Poverty Law Center's website, but whether that means that they are a hate group or not, she has never communicated that to me. It is not my understanding that she believes that they are a hate group. I would like to talk about a few things that Mr. Mews brought up during oral argument. First, Judge Radler, you had asked about the broader question. Specifically, you know, public officials speak all the time. They make statements, they criticize organizations, and what does that mean for the broader First Amendment principles? And I think the answer to that question is that if this court were to rule in Mr. Mews' or American Freedom Law Center's favor, any time that an official references an outside organization or the data that they do, they're going to be open to liability, and I think that's problematic. Judge Stranch, you had asked about... Is there a difference between conduct and speech? In other words, politicians criticize conduct, but here they're saying they're being criticized for their speech, right? Their speech advocacy. Is that different? The case law does make a difference between conduct and speech, but here I think what discovery has shown is that there was no curtailment or chilling of any speech here. You see that through the continuation of American Freedom Law Center taking on clients. There's no evidence in the record of any donor decline. There's no evidence that they've had to curtail their activities at all, and in fact, as it was pointed out earlier, they're the ones that continue to amplify the Attorney General's press release from February 2019 that's no longer even on any of the state's websites. I guess their response would be that there's been a reputational harm, that that's difficult to measure, they're not actually seeking damages, they don't have to quantify it quite as specifically as if they were. So what do we do with... I think it's fair to point out that reputation is a little bit hard to measure, but it's obviously something we can consider, and maybe the standards should be a little more lax as we assess that in terms of purposes of constitutional injury. Your Honor, I think the case law all discusses this, and it answers the question. So take Meese for an example. In Meese, the government had labeled certain films political propaganda. They said that just that mere labeling was not enough. They looked to harm for re-election chances. In BoJ, labeling the Juggalos as a hybrid gang. And then you had police stops and military denials, you had job loss, all of that was the additional plus that you needed. McGrath, you had someone labeled a communist, different organizations labeled communist, and then there was decreased donations and job loss. That's what the something more was. So just the government labeling something, the imprimatur is not enough. Do you think the case here on standing is that much different if they come forward with one donor who says, oh, I saw that the government did this, or that there was a newspaper article right after the press release that referenced the SPLC list. You guys are on this list. I'm not giving you money anymore. My $15 yearly donation is done. Do you have a different standing argument? I would say that it's fact specific, but in all of the cases, there was something more than that. There was significant, ongoing, reputational harm. And here, we just don't have any evidence of it. So it's not in the record before this court. Right. So I'm giving you a hypothetical situation. You need more than a $15 donation to be withdrawn. Is that your position? I think that would perhaps be enough to get it to trial. Okay. So then, does your argument then focus on the redressability points that you made in your brief, or you think that's good for standing, and then we move forward to the merits question? I think you would also have a traceability issue here, especially because the Southern Poverty Law Center labeled the American Freedom Law Center a hate group in 2015. You also have... In my hypothetical, the traceability question is you have evidence on it. Somebody says, hey, I saw this in the newspaper article that followed from the Attorney General's press release. I mean, a press release is usually meant to get some news coverage. Got some news coverage here. So if somebody said, hey, I saw this news coverage, and now I'm not giving you my $15 a year. Does that not deal with the traceability issue? If that were the case, then I think that would get us to trial here. But again, that's not what happened. Does it matter here that what we have is not an actual government-applied label, but a reference, clearly a reference and a citation to a place that has that information? In other words, it's republication. I'm trying to see where the extent of this type of claim works, both time-wise and proximity-wise. Is republication sufficient? Is republication two steps down sufficient? And how long does that harm last? In the republication point, all of the cases, the government was the actual one creating, applying the label. So this would be distinguishable and would be an extension of those cases. And I think that's not to say that republication couldn't cause a harm. I think it could. But you would have to have that concrete injury. Is the state committing to not publishing this list again? Your Honor, they don't have any intention to. I can tell you that. And I can tell you that the Attorney General will be out of office in eight months. It's my understanding that the unit has been very specific that it's not investigating groups, but it's investigating particular crimes, particular conduct. Correct. Are you relying on the seven-year passage of time with respect to how we should measure whether there's been impact here, whether there's been harm with respect to causation? I think that certainly helps us that nothing has happened in those seven years. But I think even without those seven years, the lack of reputational harm from, you know, even February 22, 2019 to, say, April 2019 shows that you don't have any concrete injury here. There hasn't been any harm that's been dissipated over that time? Correct. Because four of those years were attributable to the District Court judge not ruling. So it feels a little difficult. It feels hard for me to penalize the plaintiffs on this theory when that was sort of out of their hands and they did ask the District Court judge to rule more quickly and the District Court judge didn't for whatever reason. You know, Your Honor, I think you could look at it that way. I think another way to look at it is that they had four additional years to come up with some type of reputational injury and it didn't happen. If you don't have any other questions, I'd ask you to affirm. Apologies for losing my voice. Good afternoon. Assistant Attorney General Heather Meingast on behalf of Defendant John E. Johnson, the current Director of the Michigan Department of Civil Rights. Can I just ask, is there anything you would have said different? Not that I'm criticizing your friend's answers, but we've asked some of the things we're interested in. Is there anything you would have said differently in response to any of those questions? No, frankly, Your Honor. I think everything that my colleague, Ms. Barranco, so ably argued is completely applicable to  Defendant Johnson. The only really sort of distinguishing factual difference between the Attorney General and the Department was we didn't announce a hate crimes unit. We announced that we had a proposal. We were proposing to create a database in which we would collect information of incidents of hate and bias occurring throughout Michigan with the purpose of being able to better deploy educational resources and remedies to these targeted communities. So that's sort of the small factual distinction. So nothing in our press release and the idea of the database about targeting or any enforcement or investigation, any of the speakers of these incidents, just collecting this information to provide a remedy to the targeted communities. Mr. Johnson, commit to not republishing the SPLC list? I don't. There's nothing in it. We have information in the record. It was indicated that there was testimony in our record that, going back to your question of whether we agree that they are a hate group. I would just add the answer to the question I asked this time. I'm sorry. Could you repeat the question? Would he commit to not using, not referencing? I don't know. I didn't ask him that, Your Honor. He's three directors removed, and there's no indication that there's any intent to use this website again. Frankly, if we'd pursued this database and had our own information now, we wouldn't need to cite to other resources. But is there another resource out there, another group, another entity, a university that collects all this data and provides these kind of reports that would be something we could point to in the future? I don't know. But right now, I'm not aware of any plans that we utilize this group's reporting for any information. And I did not ask Director Johnson about his opinion on that. So I can't affirmatively tell you one way or the other. But there's nothing in the record that suggests the Department has any indication of sort of a repeat reliance on the report again. Right. So everything that Ms. Branco said, right, the problem here is no actual concrete evidence of an imminent injury. Their claims for reputational and economic harm simply aren't supported by the record. But we really just have our self-serving statements from Mr. Yaroshami, which really aren't sufficient evidence. There's no loss of donors, no impact from the economic side. And on the  we would measure that, right? There's nothing you're asking. The whole premise of this case I think was tenuous to begin with, right, which was this exacerbated injury. So the moment they walked in with that theory that was already going to be really hard to measure, to quantify, or to prove because of the pre-existing designation of the group as a hate group by the SPLC for years before that press release. So you start from this very difficult position, I think, of being able to have some measurable calculation of how we somehow exacerbated, and there's proof of that. So I think that was very difficult to start with, and discoveries show that they had nothing to back that up. Everything that they relied on, they're talking about the activities of third parties who were trying to interfere with the ability to have secret donations or all of these exciting news articles that have nothing to do, no reference to this press release. They post-date, or excuse me, predate the press release, and so there really is nothing in the record that shows an exacerbated injury of any way as far as reputation, and then simply nothing in there from an economic standpoint. And as far as reputational harm, they used the press release, and really a lot of the AG's comments, really as a bully pulpit, as part of their ongoing, incorporated into their mission. And so what we have here is just sort of capitalizing on this event, and I think, Judge Wadley, your question about why they didn't seek a preliminary injunction is telling, because the injury here was very temporal. If this was as bad as they say it was, then your injury was immediate, and the right thing to do, if you really thought it was harmful, was to seek that preliminary sort of relief, take the press release down, some sort of retraction. But yet we pursued through ordinary litigation for a couple of years. So the argument that this was truly harmful to them, I think, is sort of belied by the lack of any sort of imminent seeking of relief. Because nobody's talking about a press release. I'm sorry. Thank you. Okay. Sorry about that. It's okay. I just want to reemphasize this point. When this Court ruled in Parsons, it didn't say stigmatization and plus. When the Third, I believe it was the Third Circuit, was referring and cited to Meese, reputational injury alone is an injury sufficient for standing purposes. We don't need to have that plus aspect. And with regard to causation, again, this Court said the jugglers in this case also suffer alleged harm due to the force of a DOJ informational label. While the 2011 NGIC report is not the designation itself, it reflects the designation. The issues that the Cousins are struggling with, Meese v. Keene and Parsons already addressed those. And I want to get right to the injury thing. Can I take you on just a slightly different subject? It strikes me that different government offices, whether it be the Attorney General's offices or subsequent offices, they can't always do all of the work themselves. They're relying on universities or private groups or things like that to maybe just start inquiries. They're not necessarily actually bringing charges based on what another group says, but to start inquiries. And if they want to start monitoring, let's see where anti-Semitic remarks are happening and things. They might say, oh, the Anti-Defamation League keeps a list, and maybe we'll check out what they're doing. How can the government rely on resources out there, not blindly just follow what happens, but at least rely on resources out there, and maybe say, hey, we're going to be looking at what this group or what that group does in their monitoring, and we'll check it out too. How can they do that without essentially perhaps crossing a line or running into what you would say here is that they're now going to be sued as if they were a government SPLC that did this list. I do have an important thing I wanted to get to, which I'm not going to be able to, so I'll take up my three minutes on that question. They didn't say they're just going to monitor... I understand. They didn't say they're just going to monitor or we're going to take a look at. She said, I'm going to fight, I'm going to combat, I'm going to tackle. Oh, and by the way, I'm creating this hate crimes unit. Of hate, right? Not of all the groups on the list. No, she said the organizations. She said of the organizations. It's just like the press release. There's all the emails and other things that we got to discover. You made that point. Can I please get to this one thing on the damages? If you look at the interrogatories, they submitted only a portion of the interrogatories, which I found kind of interesting. This is a document, 80-11, page ID 1420. And they cited for the proposition, oh, look, see, there really haven't been harm because they haven't really lost any clients. But if you actually read what it says, as a baseline, we had 57 parties and 54 litigations as a baseline in 2017. This press release went all the way to 2020. In the first quarter, plaintiffs represented no new parties and no new litigation or pre-litigation matters. And it's interesting, they have question number six, identify donors and amounts donated. And when I was doing a drill down, they never included the answer on that. And again, even in that, we laid out, they had a spreadsheet which we laid out all the donors and it says, as demonstrated here, the donation amount received by plaintiffs dropped significantly following the announcement of the defendant's policy directive in 2019. They have that. That part was left out of the record, but it is part of the record. This is not a damages case. We relied on the affidavit and the declaration and the testimony of David Urashami in light of Parsons and Meese and all these other cases that show reputational harm. If we need damages, we can go back and get a damages expert and do that. Thank you. Thank you very much both sides for your arguments. The case will be submitted.